William Griesinger, Deceased, Margaret F. Griesinger, Widow, Petitioner *v.* Workmen's Compensation Appeal Board (Atlantic Richfield Company), Respondents.

Argued December 10, 1985, before Judges Rogers and MacPhail, and Senior Judge Barbieri, sitting as a panel of three.

*James Dunworth,* for petitioner.

*Patricia A. Mattern,* with her, *Lowell A. Reed, Jr., Rawle & Henderson,* for respondent, Atlantic Richfield Company.

Opinion by Judge Rogers, January 24, 1986:

Margaret F. Griesinger (claimant), the widow of William Griesinger (decedent), has filed a petition for review of an order of the Workmen's Compensation Appeal Board (board) overturning a referee's award of compensation on account of her husband's death. The Griesingers lived in Haverford, Pennsylvania, a Philadelphia suburb.

The decedent was employed as the Director of International Development by the Atlantic Richfield Company (employer). On November 1, 1972, he died

as the result of a coronary occlusion in New York City while on a business trip for his employer.

After hearings the referee awarded compensation based on his conclusion that the decedent died from an injury while in the course of his employment and that the injury was related to his employment. The employer appealed, and the board set aside the referee's order and remanded the matter to the referee because although the referee wrote that he did not rely upon certain hearsay testimony by the claimant concerning things told her by the decedent, the board concluded that the referee did consider them, and because the referee failed to find with sufficient specificity what caused the decedent's death. The board instructed the referee not to consider hearsay in making new findings and to make specific findings on causation.

On remand, the referee pertinently found that the decedent's employment included duties of a complex nature and involved dealings with foreign countries and corporations; that on October 30, 1972, the decedent told his supervisor of his intention to retire by January 1, 1973 and of his desire for a replacement to whom he could transfer his responsibilities; that on November 1, 1972, the decedent went to New York City by train for work-related meetings; that the decedent was found dead on a subway platform; and that the decedent died of occlusive coronary arteriosclerosis on November 1, 1972. The referee also found that the decedent had arteriosclerosis and had suffered a heart attack in 1955; and that during the two months preceding his death, the decedent was restless, irritable and tired, did not sleep regularly, and did not eat as much as before.

The referee further found as follows:

5. Decedent usually worked from his office in Philadelphia although duties took him out of

the Philadelphia area several times a year and on occasion to other countries.

. . . .

13. At work, prior to 11/1/72, Decedent was a very self-controlled individual, pleasant and always an enjoyable person to have a conversation with. The Decedent discussed retirement with [his supervisor] on several occasions prior to 10/30/72. And in the course of his assignments in the past, Decedent mentioned to [his supervisor] the availability of having younger back-up people so they could continue to carry on the work that Decedent was engaged in. The whole record, demonstrates that the Decedent, in relation to his job, was a conscientious person, and was concerned about the effect his retirement would have on his employer. . . . He was concerned about whether his employer, the Defendant, would have someone carry on the work in which he was engaged in for the Defendant, after his retirement. The Decedent made known his plans for early retirement on several occasions from the time shortly after he was employed by Defendant until 10/30/72 and discussed the need for a back-up person. Nowhere in the Record does it appear that such a back-up man was in existence during the time the Decedent worked for Defendant. The fact that the Decedent was a conscientious employee of Defendant and was concerned about how his work would be carried on after his retirement, leads the Referee to infer as a fact that the Decedent was under pressure, anxiety and tension, in the progressing of his work prior to his retirement, and was a contributing factor to his death.

336

14. The early arising of the claimant [sic] to leave for New York on 11/1/72, the trip to New York, the subway ride to PA Railroad Station which Decedent never accomplished, were contributing factors to Decedent's death.

. . . .

16. The Referee finds as a fact that Decedent's conscientiousness and Decedent's request for back-up personnel who could carry on his duties after his retirement and Decedent's concern that the projects on which he was working would be properly carried out after his retirement (all of which are set forth in Finding of Fact #13) caused Decedent to be anxious about his work activities, caused Decedent to be under pressure in respect of his work and caused Decedent to be under tension in respect of his work activities and the Referee finds as a Fact that this anxiety, pressure and tension were work-related and the Referee finds as a fact that this work-related anxiety, pressure and tension were contributing factors to Decedent's death.

17. The Referee finds as a fact that the business trip to New York City on the date of death was a deviation from Decedent's usual routine and the Referee finds as a fact that this work-connected trip produced tension and anxiety and pressure, all of which were work-related and the Referee finds as a fact that this work-related tension, anxiety and pressure was a contributing factor to Decedent's death.

18. The Referee finds as a fact that Decedent was under tension and pressure and was anxious in view of his early retirement and his concern that the business affairs that he was working on would be properly processed to com-

pletion after his retirement and the Referee finds as a fact that Decedent's restlessness and his insomnia and his level of irritability . . . were induced by his concern that the business matters that he was working on for his employer would be properly processed to completion upon his retirement and the Referee finds that that restlessness, insomnia and level of irritability were work-related and the Referee finds as a fact that the work-related restlessness, insomnia and level of irritability contributed to Decedent's death.

The referee's conclusions of law were that the decedent died of an injury in the course of his employment and that his death was related to his employment, and that he, the referee, did not consider the decedent's statements made to the claimant because they were hearsay.

The employer appealed to the board, which reversed the referee's order seemingly as not supported by the record evidence.

On appeal, the claimant principally contends that the referee's findings of fact are supported by substantial evidence. We agree.

The record evidence contains the claimant's testimony, which pertinently includes the following:

Q. [W]hat time did your husband leave when he went to work on the date of his death? What time did he leave the house?

A. [I]t was around 20 minutes after 6:00.

Q. On those days that he went to New York on business, what time did he leave the house? What time did he get up?

A. He would get up before 6:00 and he would leave the house quarter after, 20 after 6:00, because he took the 7:00 o'clock train from Thirtieth Street Station to New York.

Q. [A]bout a month before the death [of your husband] ... had you had discussions with him regarding retirement?

A. Yes.

Q. During that period of time did he display any signs of tension or anxiety or irritability which you did not see before that time?

. . . .

A. Yes.

. . . .

Q. [W]ould you tell us what you observed of your husband's conduct, let's say in the month preceding his death? ... And whether or not he was under tension as far as you could detect it.

A. I felt he was under tension.

Q. Would you tell me, if you can, how his conduct manifested tension to you?

A. Normally he would not have discussed these things with me.

Q. Why do you say that?

A. He was a very private person. He did not discuss business. He tried to keep his family and his business separated.

Q. Are you then saying that when he discussed these matters with you which touched upon business, that this was an unusual occurrence?

A. Yes.

. . . .

Q. What did you observe about your husband that gave you the impression that he was tense?

A. The fact that he wanted to discuss this with me.

Q. Was there anything else?

A. Well, I don't know really how to express it.

Q. Did he sleep regularly during that time?

A. He was restless.

Q. How was his appetite during that time?

A. Fair, I guess.

Q. Was it any different than before?

A. I don't think he was eating as much, although he never was a very big eater.

. . . .

Q. In this period of approximately a month before the death, was he more or was he less irritable than he had been previously?

A. He was more irritable.

. . . .

Q. Before this time that you've testified his discussions touched upon certain business matters, had he ever discussed business with you prior to that?

A. Very rarely.

. . . .

Q. [D]id you observe anything unusual about his physical appearance, let's say in the week prior to his death?

A. Yes. [H]e just seemed tired.

Q. Would that have been going on for a week or more; do you know?

A. Yes.

. . . .

Q. Other than seeming tired, then I take it that there were no physical manifestations of poor health that you saw in the week or so before he died?

A. I just felt, you know, that he was upset and worried.

Q. And tired?

A. Yes.

. . . .

Q. In the medical record . . . there was reference from time to time to tightness in the chest with exertion, relieved by rest. Mentioned in 1967, 1969, occasional substernal tightness with exertion, subsided rapidly with rest. March of 1972, occasional chest pain on exertion. Did you ever observe any of these types of complaints or occasions that your husband related to the physicians when he was examined?

A. Yes.

The record also includes the testimony of Dr. Paul A. McKin, the decedent's supervisor. Dr. McKin's testimony pertinently provides as follows:

Q. [On] the thirtieth of October, [two days before the decent died on November 1, 1972], did you see Mr. Griesinger . . . ?

A. Yes.

. . . .

Q. What discussion did you have with the decedent when you saw him in Philadelphia?

A. [H]e told me that he had decided that he wanted to take early retirement. He said that he would like for me to appoint a replacement for him so that he could handoff the responsibilities that he had been handling. He said that he knew it would be difficult to find a replacement and that he was in no particular hurry that this be accomplished, but that he would hope that we get this done by about the first of the year so that he could embark on his company-paid retirement.

Q. By the first of the year, you took that to mean January 1, 1973, did you not?

A. Yes.

Q. At that point in time, was Mr. Griesinger involved with a series of these complex contracts with various foreign countries and foreign corporations?

. . . .

A. He was.

Q. When he told you that he deemed that it would be difficult to find a replacement, did you agree with that?

A. Yes.

Q. His was an important job in ARCO, was it not?

A. Yes.

. . . .

Q. [D]id you ever discuss retirement with him before October 30, 1972?

A. [H]e had a number of times stated to me that it was his intention not to work until the normal retirement age of 65.

. . . .

Q. Were you involved in his assignments . . . that he held at the time he died?

A. Yes.

Q. [W]as there any discussion about retirement with Mr. Griesinger?

A. I can remember two or three times in the course of his assignment when he would make mention of the fact that the kind of job he did, projects took a long time from beginning to end and that he thought we would be wise to have back up and younger people so they could continue to carry these things through after he would take his retirement.

. . . .

Q. What business was he working on . . . on October 30, 1972?

A. Quite a number of things. We had . . . a joint venture company in Germany, which was in financial difficulty, and he was quite active in attempting to solve the financial problems of the joint venture company. He had a number of licensing activities that he was involved with through Dr. Verdol. He had these interests in the nuclear business that . . . he was developing. . . . As far as the Engelhard Company is concerned . . . he was renegotiating the licensing arrangements, the joint licensing arrangement with Engelhard.

The evidence also includes the crucial testimony of Dr. Anton Blake, the claimant's medical expert. Before counsel for the claimant posed two hypothetical questions to Dr. Blake, counsel asked Dr. Blake to assume the information contained in the claimant's medical reports dating from 1949 to 1972 describing the decedent's myocardial infarction in 1955 and other heart ailments; to assume that the decedent's work schedule required him to commute from his home in Haverford to his office in Philadelphia; and to assume that on October 30, 1972, the decedent informed his employer of his intention to retire on January 1, 1973, and that the decedent had many important complex business matters to take care of before he retired. Dr. Blake was also asked to assume "that the decedent was under unusual strain in anticipation of his retirement and in anticipation of the necessity for winding up his business affairs"; that on November 1, 1972, the decedent travelled from his home in Haverford to Manhattan for business meetings; that this travel to New York City was unusual in nature because his usual place of business was in the City of Philadelphia; that the de-

cedent was found dead on a Manhattan subway platform on November 1, 1972, in the evening; and that the Office of the Chief Medical Examiner of the City of New York believed that the cause of death was occlusive coronary arteriosclerosis.[1]

The hypothetical questions posed to Dr. Blake and his answers are as follows:

Q.  Assuming all of those things that I have related to you, do you have an opinion as to whether or not the unusual trip to New York on the date of death, the trip being made for the purposes which I have related to you and within the context of the decedent having two days prior thereto indicated his intention to retire, do you have an opinion as to whether or not that unusual trip to New York produced unusual stress and strain on the decedent?

Do you have such an opinion, Doctor?

A.  I do.

Q.  Would you give us your opinion?

. . . .

A.  I believe the trip to New York was an added strain and this contributed to his thrombosis or his occlusion.

. . . .

Q.  Doctor, assuming again all of the factors that I related to you heretofore, and assuming the answer that you gave to me in the previous question that I put to you, assuming all of those things, do you have an opinion as to

---

[1] The claimant was not required to prove that the New York trip was an event unusual to his employment; it was necessary to prove only that his injury arose in the course of employment and was related thereto. *Workmen's Compensation Appeal Board, v. Jeddo Highland Coal Co.*, 19 Pa. Commonwealth Ct. 90, 93, 338 A.2d 744, 746 (1975).

whether or not there is a direct causal connection between the stress and strain generated by the unusual trip to New York and the death?

. . . .

Would you give me your opinion?

A.   My opinion is that the stress and strain that he had undergone, the added stress and strain, did have an effect, in effect produced a coronary thrombosis.

The record evidence also contains the parties' oral agreement made at the referee's hearing that the decedent's death arose in the course of his employment.

The facts of this case are very similar to those of *Krawchuk v. Philadelphia Electric Company,* 497 Pa. 115, 439 A.2d 627 (1981) and compel the same result, that is, that the decedent's heart attack is a compensable injury. In *Krawchuk,* the Supreme Court, reversing an order of this court, upheld a referee's conclusion that the decedent's death from a heart attack was caused by his work, writing:

Not infrequently, a stress heart attack is a gradual injury wherein the pressures and strain of the job—physical, mental, or both—take their toll in small doses until, at some point, those doses in the aggregate push the heart past its limits.

. . . .

Heart attacks, unlike accidents, do not just happen, they are brought about by something or a number of things which the heart is unable to tolerate. Their timing . . . is altogether uncertain. It seems . . . that if a workmen's compensation claimant proves by competent medical opinion, credited by the fact finder, that his heart attack was brought about by a thing or

things arising from the course of his employment and related thereto, he has made out a case under Section 301(c) of the Pennsylvania [Workmen's Compensation] Act. . . .

*Id.* at 123, 439 A.2d at 631-632.

Our review of the record convinces us that the referee's findings in this case were amply supported by the record and that those findings firmly undergird the referee's conclusion that the decedent died of an injury arising in the course of his employment and related thereto.

We now examine the board's decision overturning the award of the referee. The board writes that "the crucial factual issue to be determined by this board is whether or not the decedent's death is related to his employment." We again observe that the referee's findings may be disturbed by the board only if they are not supported by substantial evidence. *Universal Cyclops Steel Corporation v. Krawczynski,* 9 Pa. Commonwealth Ct. 176, 305 A.2d 757 (1973). We have already pointed out that the referee's findings are supported by substantial evidence. Next, the board writes that after reviewing the testimony of Dr. Blake, "it is clear that he never testified that the stress of decedent's retirement or going to New York had anything whatsoever to do with the decedent's occlusive coronary arteriosclerosis." We disagree. The hypothetical question and Dr. Blake's testimony show that this evidence was clearly before Dr. Blake.

Moreover, Dr. Blake did not say on cross-examination, as the board also writes, that "the decedent's death was due to the unusual nature of his trip but [he] could not find any causal connection if the trip were not unusual." On cross-examination, counsel for the employer asked Dr. Blake whether his opinion would be different if the circumstances of the trip to New York were not unusual in the decedent's experi-

ence. Dr. Blake answered that "[i]t's impossible to answer that question.... I don't know."

Our review of the record convinces us that the claimant has shown the required causal connection between the occurrence of the decedent's heart attack and his work to establish that the decedent's death was work-related. Accordingly, we reverse the board's order and reinstate the referee's award.

## ORDER

AND Now, this 24th day of January, 1986, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is reversed; the referee's award is reinstated.